**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| GOLDEN GUERNSEY DAIRY, LLC, | Case No. 13-10044 (KG) |
| Debtor. | |
| CHARLES A. STANZIALE, JR., in his capacity as Chapter 7 Trustee of Golden Guernsey Dairy, LLC, | |
| Plaintiff, | Adv. Pro. No. 14-_____ (KG) |
| v. | |
| MILK072011, LLC, ANDREW NIKOU, BRAD PARKS, and THE UNITED STATES OF AMERICA through THE INTERNAL REVENUE SERVICE, | |
| Defendants. | |

**ADVERSARY PROCEEDING COMPLAINT**

Plaintiff Charles A. Stanziale, Jr., in his capacity as the duly appointed, qualified and serving Chapter 7 Trustee (the "Trustee") of Golden Guernsey Dairy, LLC (the "Debtor"), by and through his counsel McCarter & English, LLP, hereby states as and for his Complaint against MILK072011, LLC ("MILK"), Andrew Nikou ("Nikou"), Brad Parks ("Parks, and together with MILK and Nikou, the "Insider Defendants"), and The United States of America through the Internal Revenue Service (the "IRS," and together with Parks, MILK and Nikou, the "Defendants"),  as follows:

**Nature of the Action**

1.     This action by the Trustee seeks damages for breaches of fiduciary duties owed to the Debtor and its creditors by the Insider Defendants when the Insider Defendants caused the

Debtor to fail to give sixty (60) days' advance written notice to the Debtor's employees that they were being laid off as a result of the closing of the Debtor's business.  This failure to give sixty (60) days' advance written notice of the mass layoff to the Debtor's employees violated Wis. Stat. §§ 109 *et seq.* (the "Wisconsin WARN Act").  As a result of this violation of the Wisconsin WARN Act, the Debtor became saddled with an approximately $1,567,000 priority claim to the detriment of unsecured creditors who have yet to receive a distribution in the bankruptcy proceeding.  This priority claim would not exist if the Insider Defendants had acted in accordance with their fiduciary duties owed to the Debtor and its creditors.

2.      In addition, through this Action, the Trustee seeks damages for the Insider Defendants' breaches of fiduciary duties to the Debtor and its creditors that resulted from the Insider Defendants causing the insolvent Debtor to make a transfer to the IRS in payment of the Federal tax obligations of MILK's foreign partners.  The Trustee also seeks recovery of this payment from the IRS under applicable Delaware law and Section 548 of the Bankruptcy Code.

## Background

### A.      The Bankruptcy Proceeding

3.      On January 8, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

4.      On or about January 8, 2013, the Office of the United States Trustee for the District of Delaware appointed Charles A. Stanziale, Jr., as the interim Chapter 7 Trustee in the Debtor's bankruptcy case pursuant to Section 701 of the Bankruptcy Code.

2

5.      Charles A. Stanziale, Jr. subsequently duly qualified and is now the permanent Chapter 7 trustee in the Debtor's bankruptcy case pursuant to Section 702 of the Bankruptcy Code.

6.      The Debtor operated a dairy/milk processer selling primarily milk and dairy products to customers located throughout Wisconsin, northern Illinois and Indiana, eastern Minnesota and upper Michigan.  The Debtor was started as a co-op in 1930 and grew into one of the largest milk processors in the upper mid-west.  In 1995, the Debtor merged with Wisconsin Dairy Co-op and was renamed Foremost Farms USA.  In April 2009, the Debtor was purchased by Dean Foods Company.  In January 2010, the United States Department of Justice filed a lawsuit against Deans Foods Company.  In a March 2011 settlement with the United States Department of Justice, Dean Foods Company agreed to sell the Debtor, which was acquired by MILK, a portfolio company of OpenGate Capital, LLC ("OpenGate"), on September 9, 2011.

**B.**     **The Parties**

7.      On information and belief, Andrew Nikou owns 100% of the membership interests in OpenGate.

8.      On information and belief, MILK is majority owned as a portfolio company by the private equity company, OpenGate.

9.      MILK, a Delaware limited liability company, owns 100% of membership interests in the Debtor.

10.     MILK is the sole member of the Debtor.

11.     MILK may be served with process care of the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

3

12.     The manager of MILK is Andrew Nikou.

13.     Andrew Nikou, an individual, has an address care of OpenGate Capital, 10250 Constellation Boulevard, 17th Floor, Los Angeles, California 90067.

14.     Pursuant to the Limited Liability Company Operating Agreement for the Debtor, the Debtor shall be managed by a sole manager appointed by the member (the "Manager").  The Limited Liability Operating Agreement for the Debtor provides that the Manager shall be Andrew Nikou.  The Limited Liability Operating Agreement for the Debtor provides that the Manger is authorized to bind the Debtor in all respects.

15.     Pursuant to a Consent Resolution of the Sole Manager of Golden Guernsey Dairy, LLC, Brad Parks ("Parks") was elected President of the Debtor effective October 26, 2011.

16.     Parks, an individual, has an address of N65 W34255 Timberline Road, Oconomowoc, Wisconsin  53066.

17.     Prior to the Petition Date, MILK, Parks and Andrew Nikou were involved in the management of the Debtor and its operations.

18.     The IRS is a government agency and may be served with process by any of the following:  (i) care of the United States Attorney General, Attorney General, United States Department of Justice, Ben Franklin Station, P.O. Box 683, Washington, DC 20044, (ii) Internal Revenue Service, care of the United States Department of Justice, 1007 Orange Street, Suite 700, Wilmington, DE 19801, and (iii) Internal Revenue Service, P.O. Box 21126, Philadelphia, PA 19101-7346.

ME1 18967485v.2

C.    <u>**The Insolvency of the Debtor**</u>

19.    Although the Debtor was purchased in a so-called "bargain purchase", it was never profitable.

20.    A "bargain purchase" occurs when an acquirer purchases with consideration that is  less than the aggregate value of the purchased assets, both calculated on the basis of fair value.   Under Generally Accepted Accounting Principles ("<u>GAAP</u>") a bargain purchase is defined as "a business combination in which the total acquisition-date fair value of the identifiable net assets acquired exceeds the fair value of the consideration transferred."   *See* Financial Accounting Standards Board, Statement of Financial Accounting No. 141. "Consideration" includes the fair value of the liabilities assumed.

21.    As a result of the so-called bargain purchase, on the acquisition date of September 9, 2011, the calculated fair value of the Debtor's assets exceeded the fair value of its liabilities by $10,972,127.  This value was consistently eroded over the months leading to the Petition Date.

22.    Excluding the bargain purchase, from September 9, 2011 through December 31, 2011, the Debtor incurred an operating loss of $1,998,000 and a net loss of $2,178,000 per the Debtor's audited financial statements.

23.    For the Debtor's first full year of operations for the twelve month period ending September 30, 2012, the Debtor's management prepared financial statements reflect a net loss from operations of $4,750,000 and a net loss of approximately $6,500,000.  This translates into a net loss of 19.01 cents per gallon of milk sold.

24.    For the twelve month period ending November 30, 2012, the Debtor's management prepared financial statements reflect a loss from operations in excess of $5,000,000

ME1 18967485v.2

and a net loss in excess of $7,000,000. This translates into a net loss of 20.43 cents per gallon of milk sold.

25.    Throughout its entire history from September 9, 2011 through and including the Petition Date, the Debtor never operated profitably on a monthly basis and incurred operating losses of $300,000 to $400,000 per month.

26.    The Debtor's insolvency was predictable given its steady and consistent operating losses, capital structure, the onerous provisions contained in its milk supply agreement, its high labor costs, and interest payments. For the foregoing reasons, in September 2011, the Debtor's insolvency was inevitable and the Debtor was insolvent no later than December 31, 2011.

27.    OpenGate's equity in the Debtor was comprised entirely of the so called bargain purchase gain; OpenGate made no net investments of its own capital in the Debtor. As a result of the lack of any capital investment in the Debtor by OpenGate, its negative working capital and operating losses from September 9, 2011, the Debtor was required to obtain secured financing from third parties at interest rates that approximated fifteen percent on a per annum basis.

28.    From December 31, 2011 through the Petition Date, the Debtor did not have sufficient capital that would allow it to continue operations. The Debtor's audited financial statements reflect that the Debtor had negative working capital of -$113,190 at December 31, 2011.

29.    The Debtor's management-prepared financial statements through November 30, 2012 reflect that the Debtor had negative working capital throughout this period.

30.    The Debtor operated in a highly competitive commodity business. The fluid milk manufacturing industry operates on razor thin margins making it difficult for these entities to succeed without extreme efficiencies. The Debtor's gross margins were about one-third of the

6

industry median and it had negative interest coverage.  In an industry where the median pre-tax margin is 0.9%, the Debtor was running at a pre-tax loss of approximately 8.5% requiring a massive turnaround to achieve profitable.  This turnaround in operating margins was impossible given the Debtor's contractual obligations for the purchase of unprocessed milk and minimum purchase requirements as contained in the milk supply agreement, and its high union labor costs.

        **D.**        **Knowledge of the Wisconsin WARN Act**

31.    Prior to the Petition Date, the Debtor knew of the requirements of the Wisconsin WARN Act.

32.    On December 8, 2010, a document entitled "Employee Rights under Wisconsin's Business Closing/Mass Layoff Notification Law" (the "Wisconsin WARN Act Poster") was placed on the Debtor's electronic server in a file labeled "Labor Postings."

33.    The electronic copy of the Wisconsin WARN Act Poster was moved on the Debtor's electronic server on October 12, 2012.

34.    The electronic copy of the Wisconsin WARN Act Poster was last accessed by an employee of the Debtor on December 6, 2012.

35.    Upon information and belief, the Debtor, as required under Wisconsin law, posted a copy of the WARN Act Poster in a public place that was accessible to its employees.

36.    On November 14, 2012, David Reynolds (the Debtor's comptroller) provided Parks, Virginia Thornton and Jay Yook with the Debtor's 16-week cash forecast (the "Cash Forecast").

37.    Virginia Thornton is a Director of OpenGate and a Certified Public Accountant.

38.    Jay Yook is a Partner of OpenGate.

7

39.     The Cash Forecast reflected that the Debtor would be overdrawn on its line of credit by approximately $176,000 for the week ending November 23, 2012, overdrawn on its line of credit by approximately $397,000 for the week ending December 14, 2012, overdrawn on its line of credit by approximately $661,000 for the week ending December 28, 2012, and overdrawn on its line of credit by approximately $1,984,000 for the week ending January 18, 2013 and would remain overdrawn for the balance of the 16 week forecasted period.

40.     In an email from Parks to Nikou, dated December 22, 2012, Parks notified Nikou that "we find ourselves out of working capital in order to operate."  Parks also noted that "we have stretched our accounts payable from $1.5 million to $2 million, vendors are calling looking for payment."  In this email, Parks identified six possible strategies available to the Debtor, including "6.  Shutdown/Liquidate."

41.     On January 3, 2013, legal counsel to the Debtor informed Parks and Jay Yook of the requirements of the Wisconsin WARN Act.

**E.      The Debtor's Violation of the Wisconsin WARN Act**

42.     On January 4, 2013, the Insider Defendants decided to shut down the business operations of the Debtor.

43.     On January 5, 2013, the Debtor permanently ceased business operations and the Debtor laid off 111 of its employees in Wisconsin.

44.     On January 5, 2013, the Debtor was subject to the Wisconsin WARN Act because it had 50 or more employees in Wisconsin and all of the Debtor's employees were involved in the mass layoff and plant closing.

45.     Under the Wisconsin WARN Act, an employer is not liable for a failure to give notice to any person if it is determined that:  (1) When the notice would have been timely given,

8

that the employer was actively seeking capital or sufficient business to enable the employer to avoid or postpone indefinitely the business closing or mass layoff; and (2) That the employer reasonably and in good faith believed that giving the notice to all parties required would have prevented the employer from obtaining the capital or sufficient business.  To satisfy this exception, the employer must have a written record, made while the employer was seeking capital or sufficient business, of those activities.

46.     The Debtor's books and records do not contain a written record of the Debtor seeking capital or sufficient business to enable the Debtor to avoid or postpone indefinitely the business closing or mass layoff.

47.     Under the Wisconsin WARN Act, the Debtor was required to give its employees at least sixty (60) days' advance written notice of the closing of its business operations.

48.      Under the Wisconsin WARN Act, advance written notice of the Debtor's January 5, 2013 business closing was required to have been given to the Debtor's employees no later than November 6, 2012.

49.     The Debtor failed to provide the sixty (60) days' advance written notice required under the Wisconsin WARN Act to its employees that it would cease business operations and lay them off.

50.     As a result of the Debtor's violation of the sixty (60) days' advance written notice requirement of the Wisconsin WARN Act, each of the Debtor's former employees has a claim for wages and benefits that would have accrued during the sixty (60) days' notice period.

ME1 18967485v.2

**F.      The Violation of the Wisconsin WARN Act Damaged the Debtor and Its
Bankruptcy Estate**

51.     On March 13, 2013, the Wisconsin Department of Workforce Development, on

behalf of the Debtor's former employees in Wisconsin, timely filed a proof of claim against the

Debtor for damages arising from the Debtor's violation of the Wisconsin WARN Act.

52.     On January 3, 2014, the Wisconsin Department of Workforce Development, on

behalf of the Debtor's former employees, timely filed an amended proof of claim (the "Amended

Claim") against the Debtor for damages arising from the Debtor's violation of the Wisconsin

WARN Act.  A true and correct copy of the Amended Claim is annexed hereto as **Exhibit 1**.

53.     Through the Amended Claim, the Wisconsin Department of Workforce

Development, on behalf of the Debtor's former employees, has asserted a priority claim in an

amount not less than $1,567,229.46 against the Debtor and the Debtor's bankruptcy estate for

damages arising from the Debtor's violation of the Wisconsin Warn Act.

54.     Under Rule 7004(f) of the Federal Rule of Bankruptcy Procedure, the timely filed

Amended Claim constitutes prima facie evidence of the validity and amount of the claim asserted

by the Wisconsin Department of Workforce Development on behalf of the Debtor's former

employees.

55.     The Amended Claim is deemed allowed under Section 502(a) of the Bankruptcy

Code.

**G.      The Fraudulent Transfer to the IRS**

56.     On September 17, 2012, the Debtor issued check number 13053 out of a bank

account at Union Bank, Bearing Account No. 0011949542, payable to the "United States

Treasury," in the amount of $47,400 (the "Fraudulent Transfer").  Check number 13053 cleared

ME1 18967485v.2

on September 21, 2012.  A schedule listing the Fraudulent Transfer in greater detail is attached hereto at **Exhibit 2.**

57.    The Debtor is a limited liability company that is disregarded for Federal tax purposes.  As a result, the Debtor's financial activity is reported on the tax return of its owner, MILK.

58.    The 2011 Form 8804, Annual Return for Partnership Withholding Tax (Section 1446), filed by MILK reflects a gross Internal Revenue Code Section 1446 tax due of $47,151 plus an estimated tax liability of $249.

59.    The  2011 Form 8805s, Foreign Partner's Information Statement of Section 1146 Withholding Tax, each reflect a tax credit of $23,576 to both Next Step Consulting and NAXOS Capital Partners for the Fraudulent Transfer.

60.    The Fraudulent Transfer constitutes a transfer of interests of the Debtor in property pursuant to Section 101(54) of the Bankruptcy Code.

61.    The Debtor was insolvent when it made the Fraudulent Transfer to the IRS.

62.    The Debtor had no obligation to make the Fraudulent Transfer to the IRS.

63.    The Debtor did not receive reasonably equivalent value for the Fraudulent Transfer made to the IRS.

64.    The Debtor received no consideration in exchange for the Fraudulent Transfer made to the IRS.

## Jurisdiction and Venue

65.    The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

ME1 18967485v.2

66.     The Bankruptcy Court has personal jurisdiction over the Defendants pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

67.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

68.     Venue is proper pursuant to 28 U.S.C. § 1409(a) because this is a proceeding arising under the Bankruptcy Code and related to the Debtor's bankruptcy case under the Bankruptcy Code.

## FIRST CAUSE OF ACTION
### (Breaches of Fiduciary Duties for Causing
### the Debtor to Violate the Wisconsin WARN Act)

69.     The Trustee repeats, reiterates and re-alleges each and every allegation as set forth in paragraphs 1 through 68 hereof with the same force and effect as if fully set forth herein.

70.     By reason of their fiduciary duties to the Debtor, the Insider Defendants owed the highest duties of good faith, fair dealing, loyalty and care to the Debtor.

71.     The Insider Defendants failed to comply with the requirements of the Wisconsin WARN Act when permanently closing the business operations of the Debtor and laying off the Debtor's employees in Wisconsin.

72.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties in causing the Debtor to violate the requirements of the Wisconsin WARN Act as described above, the Debtor sustained significant damages.

73.     The Insider Defendants are liable to the Debtor in an amount to be determined at trial as a result of the misconduct alleged herein.

## SECOND CAUSE OF ACTION
### (Breaches of Fiduciary Duties Owed to the Debtor's Creditors
### for Causing the Debtor to Violate the Wisconsin WARN Act)

74.     The Trustee repeats, reiterates and re-alleges each and every allegation as set forth in paragraphs 1 through 73 hereof with the same force and effect as if fully set forth herein.

ME1 18967485v.2

75.      The Insider Defendants owed fiduciary duties to the creditors of the Debtor while the Debtor was insolvent or "in the vicinity of insolvency."

76.      By reason of their fiduciary duties to the creditors of the Debtor, the Insider Defendants owed the highest duties of good faith, fair dealing, loyalty and care to the creditors of the Debtor.

77.      The Insider Defendants failed to comply with the requirements of the Wisconsin WARN Act when permanently closing the business operations of the Debtor and laying off the Debtor's employees.

78.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties in causing the Debtor to violate the Wisconsin WARN Act as described above, the Debtor's creditors sustained significant damages.

79.      The Individual Defendants are liable to the Debtor for the benefit of the Debtor's creditors in an amount to be determined at trial as a result of the misconduct alleged herein.

**THIRD CAUSE OF ACTION**
**(Breaches of Fiduciary Duties for Causing**
**the Debtor to Make the Fraudulent Transfer to the IRS)**

80.      The Trustee repeats, reiterates and re-alleges each and every allegation as set forth in paragraphs 1 through 79 hereof with the same force and effect as if fully set forth herein.

81.      By reason of their fiduciary duties to the Debtor, the Insider Defendants owed the highest duties of good faith, fair dealing, loyalty and care to the Debtor.

82.      The Insider Defendants caused the Debtor to make the Fraudulent Transfer to the IRS.  A schedule describing the Fraudulent Transfer in greater detail is attached hereto at **Exhibit 2.**

ME1 18967485v.2

83.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties in causing the Debtor to make the Fraudulent Transfer to the IRS as described above, the Debtor sustained significant damages.

84.     The Insider Defendants are liable to the Debtor in an amount to be determined at trial as a result of the misconduct alleged herein.

**FOURTH CAUSE OF ACTION**
**(Breaches of Fiduciary Duties Owed to the Debtor's Creditors**
**for Causing the Debtor to Make the Fraudulent Transfer to the IRS)**

85.     The Trustee repeats, reiterates and re-alleges each and every allegation as set forth in paragraphs 1 through 84 hereof with the same force and effect as if fully set forth herein.

86.     The Insider Defendants owed fiduciary duties to the creditors of the Debtor while the Debtor was insolvent or "in the vicinity of insolvency."

87.     By reason of their fiduciary duties to the creditors of the Debtor, the Insider Defendants owed the highest duties of good faith, fair dealing, loyalty and care to the creditors of the Debtor.

88.     The Insider Defendants caused the Debtor to make the Fraudulent Transfer to the IRS.  A schedule describing the Fraudulent Transfer in greater detail is attached hereto at **Exhibit 2**.

89.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties in causing the Debtor to make the Fraudulent Transfer to the IRS as described above, the Debtor's creditors sustained significant damages.

90.     The Individual Defendants are liable to the Debtor for the benefit of the Debtor's creditors in an amount to be determined at trial as a result of the misconduct alleged herein.

ME1 18967485v.2

### FIFTH CAUSE OF ACTION
### (State Law Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and 6 Del. § 1304(a)(2)(a))

91.     The Trustee repeats, reiterates and realleges each and every allegation as set forth in paragraphs 1 through 90 hereof with the same force and effect as if fully set forth herein.

92.     The Fraudulent Transfer described in **Exhibit 2** constitutes a transfer of the Debtor's assets.

93.     The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer because the Debtor received nothing in exchange for the Fraudulent Transfer.

94.     At the time the transfers were made, the Debtor was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any assets or property remaining with the Debtor after the Fraudulent Transfer were made was unreasonably small in relation to the business, or constituted unreasonably small capital.

95.     The Fraudulent Transfer constitutes a fraudulent transfer which should be avoided pursuant to Section 544(b) of the Bankruptcy Code and 6 Del. § 1304(a)(2), and is recoverable pursuant to Section 550 of the Bankruptcy Code.

### SIXTH CAUSE OF ACTION
### (State Law Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and 6 Del. § 1304(a)(2)(b))

96.     The Trustee repeats, reiterates and realleges each and every allegation as set forth in paragraphs 1 through 95 hereof with the same force and effect as if fully set forth herein.

97.     The Fraudulent Transfer described in **Exhibit 2** constitutes a transfer of the Debtor's assets.

98.     The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfers because the Debtor received nothing in exchange for the Fraudulent Transfer.

ME1 18967485v.2

99. At the time the Fraudulent Transfer was made, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured or became due.

100. The Fraudulent Transfer constitutes a fraudulent transfer which should be avoided pursuant to Section 544(b) of the Bankruptcy Code and 6 Del. § 1304(a)(2)(b), and is recoverable pursuant to Section 550 of the Bankruptcy Code.

**SEVENTH CAUSE OF ACTION**
**(State Law Fraudulent Transfer Pursuant to 11 U.S.C. § 544 and 6 Del. § 1305(a))**

101. The Trustee repeats, reiterates and realleges each and every allegation as set forth in paragraphs 1 through 100 hereof with the same force and effect as if fully set forth herein.

102. There exists one or more creditors of the Debtor whose claims arose prior to the Fraudulent Transfer.

103. The Fraudulent Transfer described in **Exhibit 2** constitutes a transfer of the Debtor's assets.

104. The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer because the Debtor received nothing in exchange for the Fraudulent Transfer.

105. The Debtor was insolvent on the date on which the Fraudulent Transfer was made.

106. The Fraudulent Transfer constitutes a fraudulent transfer which should be avoided pursuant to Section 544(b) of the Bankruptcy Code and 6 Del. § 1305(a), and is recoverable pursuant to Section 550 of the Bankruptcy Code.

ME1 18967485v.2

## EIGHTH CAUSE OF ACTION
### (Fraudulent Transfer Pursuant to 11 U.S.C. § 548(a)(1)(B))

107.    The Trustee repeats, reiterates and realleges each and every allegation as set forth in paragraphs 1 through 106 hereof with the same force and effect as if fully set forth herein.

108.    The Fraudulent Transfer constitutes a transfer of the Debtor's assets.

109.    The Debtor voluntarily or involuntary made the Fraudulent Transfer to the IRS.

110.    The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer and the Debtor was insolvent on the date that the Fraudulent Transfer was made or incurred.

111.    The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer and the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital.

112.    The Debtor received less than reasonably equivalent value in exchange for the Fraudulent Transfer and the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

113.    The Fraudulent Transfer constitutes a fraudulent transfer which should be avoided pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and is recoverable pursuant to Section 550 of the Bankruptcy Code.

### Reservation of Rights

114.    The Trustee believes that additional claims in favor of the Debtor's estate against the Defendants and/or other parties may exist.  The Trustee reserves any and all rights to bring such claims under applicable law.

WHEREFORE, the Trustee demands judgment against the Defendants as follows:

a) On the First through Fourth Causes of Action, awarding the Trustee judgment against the Insider Defendants in an amount to be determined at trial, including compensatory and punitive damages; and

b) On the Fourth through Eighth Causes of Action, awarding the Trustee judgment against the IRS in an amount to be determined at trial, but no less than $47,400, plus pre-judgment interest; and

c) awarding the Trustee his attorneys' fees, costs and other expenses incurred in this action; and

d) granting the Trustee such other and further relief as the Court deems just and appropriate.

Dated: November 4, 2014
Wilmington, Delaware

**McCARTER & ENGLISH, LLP**

By: _/s/ Katharine L. Mayer_
Katharine L. Mayer (DE # 3758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Telephone: (302) 984.6300
Facsimile (302) 984.6399
kmayer@mccarter.com

- and -

Charles A. Stanziale, Jr., Esq.
Jeffrey Testa, Esq.
Scott H. Bernstein, Esq.
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Telephone: (973) 622-4444

_Attorneys for the Chapter 7 Trustee_

ME1 18967485v.2